UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Leon B. Artus, et al.**

     **v.**

**Town of Atkinson, et al.**

Case No. 09-cv-87-PB
Opinion No. 2009 DNH 154

MEMORANDUM AND ORDER

Leon B. Artus, Gary Brownfield, and Steven Lewis have sued Town of Atkinson, Philip V. Consentino, Jack Sapia, Jr., Paul Sullivan, Fred Childs, William Friel, and Francis Polito pursuant to 42 U.S.C. § 1983, alleging violations of their First Amendment rights.[1] (First Am. Compl., Doc. No. 18-2, ¶¶ 62-76.) Brownfield has also asserted a state law claim, based upon New Hampshire's "Right-to-Know" law, N.H. Rev. Stat. § 91-A:2, against Polito and the Town of Atkinson. (Id. ¶¶ 77-80.)

The individual defendants, as a group, and the Town of Atkinson have filed motions to dismiss Count I. Artus, Brownfield, and Lewis object. For the reasons set forth below, I grant both motions.

---

[1] Consentino is the Chief of the Atkinson Police Department and Atkinson's Director of Elderly Affairs. Sapia is a former selectman who heads the town's Conflict of Interest Committee. Sullivan, Childs, and Friel are current selectmen. Polito, a former selectman, serves as the moderator at Atkinson's town meetings.

## I.   <u>BACKGROUND</u>

Artus, Brownfield, and Lewis assert only one count alleging First Amendment violations.  (Am. Compl., Doc. No. 18-2, ¶¶ 62-76.)  This count, however, arises from three separate but related incidents, and only some of the plaintiffs and defendants are involved in each incident.  The incidents all involve two warrant article petitions that Artus and Brownfield circulated in an attempt to place a warrant article on the Atkinson town meeting ballot.

### A.   <u>The Warrant Article Petitions</u>

Artus is an Atkinson resident and the director and spokesman for the Atkinson Taxpayers for Fair Evaluations Committee ("ATFEC").  (Am. Compl., Doc. No. 18-2, ¶ 22.)  Brownfield, also an Atkinson resident, holds the same positions in the Atkinson Taxpayers Committee ("ATC").  (<u>Id.</u>)  The purpose of both associations is to ensure fair taxation in Atkinson.  (Artus Aff., Doc. No. 10-3, ¶ 1; Brownfield Aff., Doc. No. 10-4, ¶ 1.)  Both associations also seek to ensure that taxpayer money is used wisely by petitioning to have warrant articles relating to "fiscal responsibility, accountability, and use of taxpayers' funds" placed on town meeting ballots.  (Artus Aff., Doc. No. 10-

-2-

3, ¶ 2; Brownfield Aff., Doc. No. 10-4, ¶ 2.)[2]

In January 2009, Artus and Brownfield circulated two warrant article petitions in order to collect the signatures required to have the warrant articles placed on the ballot at the next town meeting.  (Am. Compl., Doc. No. 18-2, ¶ 23.)  One of the warrant articles proposed that the town create a full-time, fully certified Police Chief position (for which Consentino would not be eligible), and the other was related to the Elderly Affairs Office (which Consentino ran).  (Id. ¶ 24.)  Artus and Brownfield successfully gathered the required signatures and filed their petitions with the Town Clerk (Id. ¶ 25).

**B.    The Phone Call Incident**

Immediately after Artus and Brownfield filed the petitions, Consentino received copies of them and began telephoning signatories to ask why they had signed.  (Am. Compl., Doc. No. 18-2, ¶ 25.)  Consentino allegedly asked one citizen why his family "signed this shit." (Id. ¶ 26.)  A number of the

---

[2] Artus, Lewis, and Brownfield have moved to add ATFEC and ATC as plaintiffs.  (See Pls.' Mot. to Amend Compl. and Add Parties, Doc. No. 18.)  I need not decide whether ATFEC and ATC have standing because these organizations' allegations are based upon the same conduct as the allegations by Artus and Brownfield, which fail to state a claim.  Thus, the claims of the associational plaintiffs fail even if I assume for purposes of analysis that they have standing to assert them.

individuals Consentino contacted then asked Brownfield and Artus
to remove their names from the petitions.  (Id. ¶ 27.)  Some
individuals also asked Artus and Brownfield to remove them from
the ATFEC and ATC mailing lists and requested that the two
associations not contact them in any way in the future.  (Artus
Aff., Doc. No. 10-3, ¶ 7-8.)  Artus claims to have lost at least
nine supporters (Id. ¶ 8), and Brownfield claims to have lost at
least eight (Brownfield Aff., Doc. No. 10-4, ¶ 8).

**B.   The Town Meeting Incident**

In addition to serving as the director of ATC, Brownfield
works as a professional photographer.  On January 31, 2009, he
attended the deliberative session of Atkinson's annual town
meeting, where he was taking photographs for the Coalition of New
Hampshire Taxpayers newspaper.  (Am. Compl., Doc. No. 18-2,
¶ 44.)  After he took ten photographs in the same manner as other
photographers at the meeting, Polito, the moderator, ordered him
to stop taking photographs while Polito was at the podium.  (Id.
¶ 45-46.)  When Brownfield protested, Polito insisted that
Brownfield was not allowed to photograph the meeting without his
permission and ordered him to delete all of his photographs.
(Id. ¶ 47.)  When Brownfield objected that he had the right under
New Hampshire law to take the photographs, Polito loudly accused

-4-

Brownfield of disrupting the meeting, threatened to eject him, and even called for a public vote to prohibit Brownfield from taking additional photographs.  (Id. ¶¶ 48-49.)  Although Brownfield originally planned to speak about the warrant articles he supported, he decided not to do so because of Polito's "open threat" and "intimidating public humiliation."  (Id. ¶ 50.)

After this confrontation, at the next break in the meeting, Sapia (a former selectman and the head of Atkinson's Conflict of Interest Committee), accompanied by a "supporter," approached Brownfield and ordered him to delete any photographs that Brownfield had taken of Sapia.  (Id. § 51.)  Polito then approached Brownfield and demanded that he erase all photographs of the meeting.  (Id.)  Polito threatened that Brownfield would "be hearing from [Polito's] lawyer" if he did not cooperate. (Id.)  As Artus and Edward Naile (the head of the Coalition of New Hampshire Taxpayers newspaper, for which Brownfield was working) left the building with a memory card containing Brownfield's photographs, Sapia, accompanied by an unnamed Atkinson police officer, followed them out, demanding the card. (Id. ¶ 52.)  Brownfield refused these demands and kept the memory card.

**C.   <u>The Lewis Incident</u>**

Lewis, another Atkinson resident, alleges that he refused to sign the 2009 petition, despite agreeing with its goals, because he feared, based upon prior harassment, that Consentino would retaliate against him.  (Am. Compl., Doc. No. 18-2, ¶ 32.)  Lewis alleges that he was fearful because Consentino (1) harassed him in 2000 after he filed a petition for a warrant article similar to the one in the instant case (<u>id.</u> ¶ 31(c); Lewis Aff., Doc. No. 10-5, ¶¶ 4-6); (2) allegedly sabotaged his son's application for employment at a nearby police department (Am. Compl., Doc. No. 18-2, ¶ 31(c); Lewis Aff., Doc. No. 10-5, ¶ 7); and (3) speaks to him sarcastically or simply glares at him when they encounter each other (Lewis Aff., Doc. No. 10-5, ¶ 9).  In addition, Lewis claims he is fearful because an Atkinson police officer called Lewis's son in 2007 and said Lewis should "watch what he says in Town."  (<u>Id.</u> ¶ 8.)

## II.   <u>STANDARD OF REVIEW</u>

On a motion to dismiss for failure to state a claim, I accept as true the well-pleaded factual allegations of the complaint and draw all reasonable inferences therefrom in the plaintiffs' favor.  <u>Martin v. Applied Cellular Tech., Inc.,</u> 284

F.3d 1, 6 (1st Cir. 2002).  Although the complaint need not include detailed factual allegations, "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" is required. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  The complaint must "state a claim . . . that is plausible on its face," and that "plausibility standard," while not a "probability requirement," requires more than a "sheer possibility that a defendant has acted unlawfully."  Id. (internal quotations and citations omitted).

### III.  ANALYSIS

The defendants have launched a multifaceted attack on the complaint.  They argue that Artus and Brownfield's allegations arising out of Consentino's phone calls to their supporters fail to state a viable First Amendment retaliation claim under § 1983. They also argue that Brownfield may not sue Polito based upon his conduct at the town meeting because Polito has absolute legislative immunity, and may not sue Sapia under § 1983 because Sapia did not act under color of state law.  In addition, they argue that Lewis's First Amendment claim against Consentino is

barred by the three-year statute of limitations that applies to § 1983 actions that arise in New Hampshire.  I evaluate the merits of each of these arguments in turn.

A.   **Artus and Brownfield Fail to State a First Amendment Claim Against Consentino Based upon the Phone Call Incident**

To state a viable claim of First Amendment retaliation under § 1983, a plaintiff must show that the defendant intended to chill his expression.  See Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994) (the defendant's "intent or desire to curb . . . expression" must be the "determining or motivating" factor behind his action).  In addition, the defendant's action must be such that it would curb the expression of a "reasonably hardy individual[]."  See Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (setting out this standard for claims made in the employment context pursuant to § 1983 for First Amendment violations).[3]

_____

[3] Artus and Brownfield might argue that the Agosto standard does not apply in non-employment contexts.  However, Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005), suggests otherwise. Bennett involved First Amendment retaliation outside of the workplace.  The court explained that almost all circuits, including the First, require plaintiffs to establish that a reasonable person (often called a "person of ordinary firmness") would be chilled from speaking to state a First Amendment retaliation claim, and thus suggested that the standard Agosto articulates in the employment context may be applied in non-employment contexts as well.  Id. at 1250-51.

Artus and Brownfield have not cited facts sufficient to
support the claim that Consentino's actions would have chilled
the speech of a "reasonably hardy" person.[4]  The plaintiffs'
harshest specific allegation is that Consentino called one person
"angrily demand[ing] . . . an explanation as to why his family
'signed this shit.'"  (Am. Compl., Doc. No. 18-2, ¶ 26.)  A
"reasonably hardy" person, however, would not remove his name
from a petition whose goals he supported because of such demands
even if the alleged speaker is both the chief of police and
director of the local Elderly Affairs Office.  The complaint does
not allege that Consentino told any elderly citizens he would
stop providing them with certain benefits if they signed the
petition, nor does it allege that anyone who called Artus and
Brownfield cited this fear, or any similar fear.  Thus, the
conclusory allegation that Consentino used "his authority as
Police Chief and Director of the Elderly Affairs [O]ffice to
intimidate Atkinson citizens into remaining silent" (Am. Compl.

---

[4] If Artus and Brownfield have a viable First Amendment
claim, it is either because they have standing to invoke the
First Amendment interests of third parties who were chilled by
Consentino's actions or because Consentino violated plaintiffs'
own First Amendment associational rights by chilling third
parties from associating with them.  In either case, plaintiffs
must allege conduct that would have chilled a reasonably hardy
person from engaging in protected conduct.

¶ 28) is a "naked assertion devoid of further factual enhancement" and does not meet the <u>Iqbal</u> standard.  <u>See</u> 129 S. Ct. at 1949.

**B.   <u>Brownfield Fails to State a Claim Against Polito or Sapia Based upon the Town Meeting Incident</u>**

**1.   <u>Brownfield's Claim Against Polito Fails Because Polito Has Absolute Legislative Immunity</u>**

Brownfield, who served as a photographer at the Atkinson town meeting, appears to make three claims based upon Polito's actions: (1) that Polito denied Brownfield the right to take photographs and use them to express his views; (2) that Polito engaged in improper viewpoint discrimination by prohibiting Brownfield from taking photographs while allowing other photographers to continue their work; and (3) that Polito chilled Brownfield from speaking at the meeting by publically harassing and embarrassing him.[5]  All three claims fail because Polito is

---

[5] Brownfield also alleges that the Town of Atkinson is liable for Polito's actions because the town meeting incident was "a result of the town's <u>de facto</u> policy and custom of permitting its officials to oppress free speech through retaliation and harassment against political adversaries."  (Mem. of Law in Supp. of Pls.' Objection to Def. Town of Atkinson's Mot. to Dismiss All Claims in Count I, Doc. No. 25-2, at 26.)

A municipality may be liable under § 1983 if a violation of First Amendment rights resulted from "execution of [a municipal] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." <u>Monell v. Dep't. of Soc. Servs.</u>, 436 U.S. 658, 694 (1978).  Even

protected by absolute legislative immunity.

"Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities." Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998).  Courts use a functional test to determine what activities are legislative: "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  Id. at 54. Once a court determines that an act is legislative, the court

-----

the acts of one individual may constitute "policy" if that individual is a "decisionmaker" who "possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).

   If Brownfield is basing his allegation of municipal liability on a town "custom" of allowing harassment, he has not met Iqbal's pleading requirements.  The amended complaint alleges that the Town of Atkinson had a "custom" of "allowing Chief Consentino to engage in abuses of power and coercion of citizens who dare to stand up to him" and cites eight examples to demonstrate Consentino's past abuses of power.  (Am. Compl., Doc. No. 18-2, ¶ 31.)  It is debatable whether these facts are even sufficient to state a claim that Atkinson has a "custom" of allowing Consentino to harass citizens; they are certainly not sufficient to state a claim that Atkinson has a custom of allowing town moderators to prohibit individuals from taking photographs through illegal viewpoint discrimination.

   Alternatively, Brownfield may be alleging municipal liability because he believes Polito is a "decisionmaker" with "final authority to establish municipal policy."  See Pembaur, 475 U.S. at 481.  However, Brownfield has not cited specific facts to support the allegation that Polito was a final policymaker or that he was carrying out a policy enacted by others (e.g., the selectmen).  Thus, Brownfield has not met Iqbal's standard on this theory of municipal liability, either.

ought not consider the motives of the legislator: "The claim of an unworthy purpose does not destroy the privilege." Tenney v. Brandhove, 341 U.S. 367, 377 (1951) (discussing federal legislative immunity; after Bogan, the same principles apply to local legislative immunity).  To subject a legislator to the burdens of discovery and a trial based on a plaintiff's allegations of illicit motives would undermine the goals of legislative immunity.  Legislative immunity is particularly important at the local level because if it is not granted, local legislators, who are often "part-time citizen-legislator[s]," might be "significantly deter[red]" from "service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability."  Bogan, 523 U.S. at 52.  Finally, if the activity at issue is legislative, the actor may not be held liable even if the activity violates the Constitution, so long as it is not "flagrantly violative of fundamental constitutional protections."  Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 634 (1st Cir. 1995).

    Legislative immunity will protect an individual who, when acting as a moderator during legislative deliberations, enforces a rule to keep the proceedings in order.  See id. at 631-32 (legislative immunity protected the Speaker of the Rhode Island

-12-

House of Representatives and the "head doorkeeper" when they enforced a rule, which the legislative body had adopted, banning lobbyists from the House floor, and its perimeter, during House sessions); see also Carlow v. Mruk, 425 F. Supp. 2d 225, 235-36, 239 (D.R.I. 2006) (legislative immunity protected moderator at a fire district meeting when he announced a rule of order prohibiting videotaping except by the press and enforced a rule of order that banned nonresidents from speaking or otherwise participating).  In New Hampshire, town meeting moderators play a role similar to the role the Speaker of the House and moderator played in Harwood and Carlow.  In New Hampshire, a moderator's duties include "presid[ing] in the town meetings, regulat[ing] the business thereof, [and] decid[ing] questions of order."  N.H. Rev. Stat. Ann. § 40:4 (2009).  Specifically, the law provides that "[n]o person shall speak in any meeting without leave of the moderator," "all persons shall be silent at the desire of the moderator," and, if any person "persist[s] in [disorderly] behavior" after a warning from the moderator, "the moderator may command any constable or police officer, or any legal voter of the town, to remove such disorderly person from the meeting and detain such person until the business is finished."  Id. §§ 40:7-8.

Polito, as a moderator acting to enforce order at a town meeting, is immune from liability under § 1983.  Although Polito was not establishing or enforcing a specific rule when he ordered Brownfield to stop taking photographs, he was exercising his general authority to regulate the meeting and decide questions of order.[6]

Brownfield relies upon Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1 (1st Cir. 2000), in an attempt to argue that Polito is liable for his actions as a moderator because they were administrative, not legislative, in nature.  (See Mem. of Law in Supp. of Pls.' Objection to Defs.' Joint Mot. to Dismiss All

---

[6] A person moderating public discussion at a local public meeting may not always be immune from § 1983 liability.  Some local public meetings are split into periods of non-legislative public comment (sometimes called the "town meeting" portion) and periods of legislative activity during which the public may not comment.  See, e.g., Hanson v. Bennett, 948 F.2d 397 (7th Cir. 1991).  At that type of meeting, a person who maintains order during the public comment portion is not acting in a legislative capacity.  Id. at 400-403.  However, the typical New England local meeting (called a "town meeting") is entirely legislative. See Curnin v. Egremont, 510 F.3d 24, 30 (1st Cir. 2007) (referring to "the town meeting" as "a deliberating legislative body" and distinguishing "municipal-level public meetings" that allow public comment during only a portion of the meeting from typical New England-style meetings).  It appears that the Atkinson town meeting was a typical New England-style meeting in that the residents were the legislators — they discussed and then voted on all agenda items.  Thus Polito, who kept order throughout this process, acted in a legislative capacity for the entire meeting.

-14-

Claims in Count I Asserted Against Defs. in Their Individual Capacities, Doc. 10-2, at 30-31.)   In <u>Acevedo</u>, the court explained the two-part analysis it undertakes to characterize an act:

> First, if the facts underlying the decision are "generalizations concerning a policy or state of affairs," the decision is legislative.  If the decision stems from specific facts relating to particular individuals or situations, the act is administrative.  Second, the court must consider the "particularity of the impact of the state of action."  "If the action involves establishment of a general policy, it is legislative;" if it "single[s] out specifiable individuals and affect[s] them differently from others," it is administrative.

<u>Id.</u> at 9 (quoting <u>Cutting v. Muzzey</u>, 724 F.2d 259, 261 (1st Cir. 1984)).  Brownfield argues that Polito "was not enacting a generalized policy regarding photography at the meeting," but rather was "singl[ing] . . . Mr. Brownfield out and prevent[ing] <u>only him</u> from taking photographs," and thus was acting in an administrative capacity.  (<u>See</u> Mem. of Law in Supp. of Pls.' Objection to Defs.' Joint Mot. to Dismiss All Claims in Count I Asserted Against Defs. in Their Individual Capacities, Doc. No. 10-2, at 31.)

Brownfield's argument fails because he misapplies the <u>Acevedo</u> test.  A moderator's job of keeping order will often involve singling out one disorderly individual.  Furthermore,

-15-

state statutes cannot anticipate and prohibit every possible
disorderly act.  Thus, a moderator must be granted flexibility
and discretion, as New Hampshire moderators are by state law, to
run meetings as they see fit.  See N.H. Rev. Stat. Ann. § 40
(2009); see also Curnin v. Town of Egremont, 510 F.3d 24, 31 ("In
[deliberating legislative bodies], some measure of discretion is
inherent in the role of moderator.  The moderator is charged with
facilitating an efficient and orderly town meeting.").  When a
moderator uses his authority to single out a disorderly
individual and tries to address a problem in a way that will
allow the meeting to continue efficiently, he may not be held
liable for doing so.  Brownfield attempts to hold Polito liable
because he allegedly acted with improper motive.  Such claims are
exactly the types of claims legislative immunity is meant to
protect defendants against.  Thus, I dismiss the claims against
Brownfield that relate to his actions as a moderator.[7]

---

[7] Brownfield also alleges that Polito, in addition to
telling him to stop taking photographs and threatening to eject
him during the meeting, also approached him at a break in the
meeting and demanded that he erase all the photographs of the
meeting.  (Am. Compl., Doc. No. 18-2, ¶ 51.)  Polito threatened
that Brownfield would "be hearing from his lawyer" if he did not
cooperate.  (Id.)  No claims based on Polito's conduct during the
break in the meeting will survive because Polito was not acting
"under color of" state law during that time, which § 1983
requires.  See West v. Atkins, 487 U.S. 42, 48 (1988).  A

-16-

**2.   Brownfield's Claim Against Sapia Fails Because Sapia
        Did Not Act Under Color of State Law**

Brownfield claims that Sapia violated his First Amendment rights because (1) Sapia approached him at a break in the town meeting and ordered him to delete all his photographs of Sapia, and (2) Sapia later followed two of his associates out of the building demanding the memory card from his camera.  (Am. Compl., Doc. No. 18-2, ¶¶ 51-52.)  These allegations, even if true, do not state a claim because Sapia was not acting "under color of" state law.

To state a claim under § 1983, a plaintiff must allege that the defendant acted "under color of" state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  "[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State.  It is enough that he is a willful participant in joint action with the State or its agents."  Dennis v. Sparks, 449 U.S. 24, 28 (1980).  See also Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 351 (1st Cir.

--------------------------------------------------

defendant acts "under color of" state law when he "exercise[s] power possessed by virtue of state law and made possible only because [he] is clothed with the authority of state law."  Id. at 49 (internal quotation omitted).  The fact that Polito threatened Brownfield with his personal lawyer, as opposed to with some municipal punishment (e.g., a fine), shows that during this interchange, Polito was not acting "under color of" state law.

-17-

1995) (suggesting that the required joint action can be a "plan, prearrangement, conspiracy, custom, or policy").

Brownfield has not pled facts that support the inference that Sapia was involved in any plan, prearrangement, conspiracy, custom, or policy to deprive Brownfield of the right to take photographs at the meeting.  Brownfield does not cite evidence of any prior agreement between Sapia and Polito.  Their actions were not so concerted as to imply a previous agreement.  Sapia approached Brownfield at a break in the meeting alone.  (Am. Compl., Doc. No. 18-2, ¶ 51.)  Although Polito approached Brownfield during the same break, he did so separately.  (Id.) In addition, Polito ordered Brownfield to delete all the photographs from the meeting, whereas Sapia only demanded that Brownfield delete pictures of him.  (Id.)

The plaintiffs suggest that Sapia may have acted jointly with another state actor besides Polito: an unnamed police officer.  (Id. ¶ 52.)  This police officer accompanied Sapia out of the building when Sapia followed Artus and Edward Naile (who runs the newspaper for which Brownfield was taking photographs, and to whom Brownfield had given his camera) out of the building to demand the camera's memory card.  (Id.)  However, the plaintiffs do not allege facts that support the inference that

-18-

there was a conspiracy or any type of plan between the police officer and Sapia.  The plaintiffs assert that "Mr. Sapia . . . used his status as a member of Defendant Consentino's political clique to enlist a police officer into accompanying him in his efforts to intimidate Mr. Brownfield and Mr. Artus, thus cloaking his demands under color and authority of the law."  (Mem. of Law in Supp. of Pls.' Objection to Defs.' Joint Mot. to Dismiss All Claims in Count I Asserted Against Defs. in Their Individual Capacities, Doc. No. 10-2, at 30.)  However, this assertion is a mere conclusion, not supported by facts and therefore not entitled to an assumption of truth.  Therefore, I dismiss Brownfield's claim against Sapia.

**C.**  **Lewis Fails to State a Claim Against Consentino Because He Does Not Allege Any First Amendment Violation Arising from Conduct Occurring Within the Statute of Limitations**

Lewis alleges that Consentino violated his First Amendment rights by harassing him so severely between 2000 and 2009 that he was chilled from signing Artus and Brownfield's petition in 2009. Specifically, Lewis alleges that in 2000, Consentino retaliated against him for filing a warrant article petition similar to the one Artus and Brownfield filed in the instant case by coming to his office and yelling at him in an outrageous manner.  (Am. Compl., Doc. No. 18-2, ¶ 31(c); Lewis Aff., Doc. No. 10-5, ¶¶ 4-

6.)  A few years later, when Lewis's son applied for a job at a
nearby police department, Consentino allegedly contacted the
police chief there and suggested that the son was not a good
candidate for the job.  (Am. Compl., Doc. No. 18-2, ¶ 31(c);
Lewis Aff., Doc. No. 10-5, ¶ 7.)  Lewis also alleges that in
2007, after he made a sarcastic comment to a police officer who
was laxly investigating a break-in at his son's house, an
Atkinson police officer called his son and said Lewis should
"watch what he says in Town."  (Lewis Aff., Doc. No. 10-5, ¶ 8.)[8]
Finally, Lewis alleges that "from 2000 to the present day,"
Consentino has "many times treated [him] either with sarcasm or
[has made] a point of glaring at [him] before pointedly ignoring
[him]."  (Id. ¶ 9.)

Any claim arising from Consentino's 2000 harassment would
normally be time barred because of New Hampshire's three-year
personal injury statute of limitations, which governs this suit.
See N.H. Rev. Stat. Ann. § 508:4 (2009); Centro Medico del
Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir.

---

[8] The amended complaint says an officer "forwarded a message
from Chief Consentino that Mr. Lewis 'had better watch [sic] he
says' about Chief Consentino and his police department," but, as
the defendants point out, that allegation is not supported by
Lewis's affidavit.  (Defs.' Reply Mem., Doc. No. 21, at 7 n.6.)

2005) (a federal court must borrow the forum state's personal
injury statute of limitations in a § 1983 suit).  However, Lewis
argues that he may still bring a claim based on the 2000 conduct
because of the "continuing violation" doctrine.  (See Mem. of Law
in Supp. of Pls.' Objection to Defs.' Joint Mot. to Dismiss All
Claims in Count I Asserted Against Defs. in Their Individual
Capacities, Doc. No. 10-2, at 17.)  Lewis alleges that
Consentino's 2007 actions and ongoing "sarcasm" and "glaring" are
"continuing violations" that allow him to bring a claim based, in
part, on the 2000 conduct.  I disagree.

    Lewis misapplies the continuing violation doctrine.  A
plaintiff can only invoke the doctrine "under certain narrow
conditions."  Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104,
107.

> Although the name of the doctrine may sound auspicious for
> late-filing plaintiffs, it does not allow a plaintiff to
> avoid filing suit so long as some person continues to
> violate his rights.  "The 'continuing violation' doctrine is
> misnamed. . . .  The office of the misnamed doctrine is to
> allow suit to be delayed until a series of wrongful acts
> blossoms into an injury on which suit can be brought."

Id. (quoting Morales-Tañon v. Puerto Rico Elec. Power Auth., 524
F.3d 15, 18-19 (quoting Limestone Dev. Corp. v. Vill. of Lemont,
520 F.3d 797, 801 (7th Cir. 2008))).  Lewis could have sued
within three years for Consentino's 2000 conduct if that conduct

chilled his speech.  However, he did not do so, and he does not convincingly argue that the 2000 harassment, the sabotaging of his son's employment application, the 2007 phone call, and the ongoing glaring and sarcasm have only now blossomed into an injury on which suit can be brought.  Thus, he cannot state a claim unless he alleges facts that show that Consentino violated his First Amendment rights within the three-year statute of limitations period.  Lewis fails to do so.

     The allegation that, in 2007, a police officer told Lewis's son that Lewis had better "watch what he says in Town" is insufficient to state a claim.  Not every vague threat will support a First Amendment claim.  The alleged act must be sufficiently severe to curb the expression of a "reasonably hardy individual[]."  See Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989).  Even if Consentino himself told Lewis, "You should watch what you say," it would not be sufficient to chill the speech of a "reasonably hardy" person.  Furthermore, there is no evidence here that Consentino was even behind the message.  The police officer who called Lewis's son was not Consentino, nor did that person say the message was from Consentino.  Thus, even if the threat were sufficiently severe, it would not be sufficiently linked to Consentino to state a

-22-

claim.

The allegation that, between 2000 and 2009, Consentino used a sarcastic tone of voice and glared at Lewis repeatedly is also insufficient to state a claim.  In some circumstances, a glare and the use of a sarcastic tone of voice might be enough to chill the speech of a "reasonably hardy" person.  Here, however, Lewis fails to provide the details required by Iqbal to allege such circumstances.  See 129 S. Ct. 1937.  Because Lewis fails to show a continuing violation that blossomed into an actionable claim within the three-year statute of limitations, he cannot use Consentino's conduct in 2000 to support his claim.

D.    **State Law Claim and Counterclaims**

When a district court has dismissed the claims over which it had original jurisdiction, the court may exercise its discretion to decline supplemental jurisdiction as to any remaining state law claims.  28 U.S.C. § 1367(c); Marrero-Gutierrez v. Molina, 491 F.3d 1, 7 (1st Cir. 2007).  Plaintiffs' remaining claims and all of the counterclaims are based on state law.  I decline to exercise supplemental jurisdiction over these claims and direct the clerk to remand what remains of the case to state court.

#### IV.   **CONCLUSION**

For all of the foregoing reasons, I grant the Town of Atkinson's motion to dismiss (Doc. No. 11) and the group of individual defendants' motion to dismiss (Doc. No. 6).  What remains of the case shall be remanded to state court.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

October 14, 2009

cc:  Charles P. Bauer, Esq.
     Charles G. Douglas, III, Esq.
     Garry R. Lane, Esq.
     Jason R. L. Major, Esq.
     James G. Walker, Esq.